IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGEANN HILL, | ) | Case No. 5:06 CV 1888 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | (Resolving ECF No. 23) |
| v. | ) | |
| | ) | |
| SANFORD ROSE OPPORTUNITY | ) | Magistrate Judge James S. Gallas |
| CENTER, INC., ET AL., | ) | |
| | ) | |
| Defendant. | | |

Defendants Sanford Rose Opportunity Center, Inc. ("SROC") and Tech Center, Inc.

("Tech Center") (together, "Defendants") have moved for summary judgment as to plaintiff

Georgeann Hill's ("Hill") claims of age discrimination in violation of the Age Discrimination in

Employment Act, 26 U.S.C. §621 *et seq.*, and state common law claims of breach of implied

contract and promissory estoppel.  For the reasons set forth herein, the motion is granted.

***Background:***

Tech Center is primarily involved in the recruitment and placement of temporary

employees with employers.  SROC is an executive search firm primarily involved in the

recruitment and placement of highly skilled, highly paid employees in businesses.  Both SROC

and Tech Center employ sales employees who recruit the temporary employees and solicit

businesses that have employment needs.  At the time of the termination of Hill's employment,

Douglas Eilertson was the President of both Tech Center and SROC.

Hill was employed by Tech Center from November 1999 until September 19, 2005. She

was 56 years old when hired and 62 years old at the time of her termination.  In the 1990s, Hill

ran her own job placement and temporary employment agency, Technipower, which had 75

employees placed as temporary workers in the Akron area and did nearly $2 million in business. In October 1999, in the aftermath of an untidy divorce that left her with more than half a million dollars in debt, Hill closed Technipower and went to work for Tech Center.  Hill claims she was hired to bring her customers to the Tech Center entities. When Hill was hired, the president of both defendant companies was Sanford Rose.  At some point, Doug Eilertson became president of the companies and he and his wife control them.  Both companies share a single, undivided office space.

Hill admits that when she began her employment in 1999, she signed an employment agreement with Tech Center (not SROC), that included the following provisions:

- I or my employer may terminate my employment at any time, with or without cause....

- This Agreement supercedes any prior employment agreement. This Agreement may not be changed except by a written agreement signed by my Manager or a Corporate Officer....

Despite this written agreement, Hill claims that Sanford Rose promised her that she would be employed with both SROC and Tech Center for life.[1]

Hill claims that at the time she was hired, her primary duty was to bring her existing customer base to SROC/Tech Center.  Her additional duties were to generate sales and marketing for the whole company, including other recruiters.  She was also responsible for the "team function" of managing the company's classified advertising in the *Akron Beacon Journal*, a local newspaper.  Hill estimates that her classified advertising duties required 50 to 60 hours of her time per month.

---

[1]There is no testimony from Mr. Rose in the record.  According to defendants, Mr. Rose is incapacitated by dementia.

SROC/Tech Center did not have employee evaluations or written policies concerning employee performance or expectations.  Eilertson testified that he had his own formula "in his head" that he used to evaluate an employee's performance.  According to Eilertson, an employee was to generate income of at least three times the employee's salary, but he did not tell employees that if they did not live up to this formula they would be terminated.  Rather, he urged all employees to improve their sales performance.  Hill complains that Eilertson did not always supply her with weekly summaries of her sales and then complained that the summaries were often incorrect.

In early 2005, Mr. Eilertson asked each sales employee to fill out a business development plan to include the income they hoped to generate during the coming year with the expectation that it was to be optimistic.  Hill set goals of 59 temporary placements for the year, 8 direct placements and 7 contract employee placements. Her projected total through September was 49 temporary placements.  According to Hill, at the time of her termination in September 2005, she had placed only 13 or 14 temporary employees and made one direct placement.

In January 2005, nine months before Hill's termination, Mr. Eilertson bestowed on her the title of vice president with an office-wide announcement and a dozen yellow roses.  In his letter to Hill regarding the vice president title, Eilertson emphasized that he gave the title for the sole purpose of "gain[ing] access to hiring decision makers for [her] business development purposes."  (Plaintiff's Ex. 2).  Despite the change of her title, Hill's duties, compensation and authority remained unchanged.  (*Id.*)  Eilertson also reminded Hill that her employment was at-will. (*Id.*).

SROC/Tech Center contend that following Hill's promotion to vice president, her sales

-3-

dropped dramatically so that by August and September 2005 she had no temporary employees on assignment and generated no revenue for the company during those months.  In fact, defendants contend they lost money because Hill's salary and overhead were so much greater than the sales revenue she generated.  Mr. Eilertson regarded Hill as the lowest performing employee in the company, and terminated her employment on September 20, 2005.  The next day, Eilertson provided Hill with a letter in which he explained that the reasons for her termination were that her job performances were unacceptable and that she was unproductive and uncooperative.  Hill thereupon filed the instant lawsuit and defendants have now moved for summary judgment.


***Summary Judgment Standard:***

Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment.  *Anderson*, 477 U.S. at 255.

-4-

The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979).  However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file.  *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  In the final analysis, "the threshold inquiry ...[is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340.  Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

### Age Discrimination Claim:

### Number of Employees:

SROC raises the threshold issue of whether it is entitled to summary judgment on Hill's ADEA claim on the grounds that it does not have the requisite twenty employees to be an employer under the ADEA.  Hill counters that SROC and Tech Center should be combined when determining the number of employees for ADEA purposes, and that when considered together, the employee count exceeds twenty.

Under the "single employer" or "integrated enterprise" doctrine, two companies may be considered so interrelated that they constitute a single employer subject to liability under the ADEA. *See Armbruster v. Quinn*, 711 F.2d 1332, 1337-38 (6th Cir.1983) (Title VII); *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360 (6th Cir.1982) (ADEA).  In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *York*, 684 F.2d at 362.  None of these factors is conclusive, and all four need not be met in every case. *Armbruster*, 711 F.2d at 1337-38.  Nevertheless, control over labor relations is a central concern. *Id.* at 1337.  Defendants admit that Douglas Eilertson is the president of both SROC and Tech Center, that he is responsible for both companies' day-to-day operations, and that he and his wife are the sole shareholders of both SROC and Tech Center.  The two businesses share the same office space.  These facts militate in favor of considering SROC and Tech center as a "single employer" for ADEA purposes.

SROC alleges that at all times since 1999 it has had less than 20 employees.  Defendants aver that at the time of Hill's termination in 2005, SROC and Tech Center employed a total of 15 employees in the office "involved in sales and administration of the business."  (Eilertson Aff. at ¶11).  Defendants did not make any representation of the number of Tech Center temporary employees placed with its customers and did not refute Hill's claims that at the time she was terminated the company collectively employed 15 people within her office and that she placed between seven and 14 additional employees on the payroll.  SROC in its reply appears to have

-6-

backed away from its argument by not refuting Hill's opposition.  SROC is not entitled to summary judgment on Hill's ADEA claim because there is a genuine issue of material fact as to whether it had the requisite number of employees to be an employer as defined by the ADEA.

***Direct Evidence:***

An employee may establish a claim by offering either direct or circumstantial evidence of age discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). This court will first examine whether, as Hill contends, there is direct evidence of age discrimination in this case.  Hill argues that throughout her employment Mr. Eilertson made the following derogatory comments about older workers:

> • "I was having gum surgery, recessive gum surgery, and Mr. Eilertson said, 'You need to take care of that, Georgeann. As we grow old we have to take care of ourselves.'  "He said 'You don't want to look like Linda [a co-worker]. She looks like a chipmunk with no teeth.'  "Now, Linda's younger than I am, but not all that much."

> • "I was having a conversation with Mr. Eilertson one day at lunch, and I said "You know, I plan on working at least until I'm 70," and I said it sort of in jest, but we were talking about something about the willing ness of people to stay on and be dedicated and I always thought that was an attribute. . . and he says, "Well, that would be fine.  Just don't tell anybody how old you are."

> • "[Eilertson] told me after I was hired that he'd asked me what kind of music I liked, whether it was The Beatles or rock-n-roll, and I don't remember exactly all the options I had, because he was trying to figure out how old I was and he couldn't ask me that legally."

> • Regarding former Vice President Dave Ally's termination, Hill could not recall precisely what Eilertson had said, but she claims that Eilertson stated that Ally was "too set in his ways," which Hill interpreted as a reference to his age, and that Eilertson said that he was glad Ally is gone.

> • Eilertson commented to Hill that he believed another office manager was ineffective in the workplace because he was hard of hearing, and that Eilertson wished he would quit. Hill did not believe the office manager's hearing impairment was that severe, and her impression was that Eilertson

attributed the impairment to the worker's age.

Hill does not state when these alleged remarks were made, so presumably these comments were made some time between her hiring in 1999 and her termination in 2005.  Hill represents that these are examples of direct evidence of age discrimination.  Direct evidence of discrimination would be evidence that, if believed, would prove the existence of a fact in issue without an inference or presumption.  *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 548 (6th Cir. 2004).  "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, [ ... ] constitute direct evidence of discrimination."  *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989).  In *Rowan*, the Sixth Circuit held that when managers make age-biased statements outside the context of the decision to discharge the plaintiff, the statements are not direct evidence of age discrimination.  *Rowan*, 360 F.3d at 550.

On their face, not one of the statements Hill labels as direct evidence of age discrimination directly relate to Eilertson's decision to discharge her.  Two of the statements relate to other employees other than Hill (Dave Ally and an unnamed office manager).   Hill admits that Eilertson's criticism of an employee with a hearing impairment is not age-based.  On its face, the statement does not refer to the employee's age and Hill made her own inference that the comment was discriminatory based on age because, in her opinion, if Eilertson had been talking about a younger person, "he'd had said he needed a hearing aid."

The alleged statement regarding Hill's recessive gum surgery is about criticizing another employee's physical appearance, not Hill's appearance or Hill's ability to work.  Eilertson's alleged response to Hill's statement that she planned to work at Tech Center until she is seventy years old does not evidence discriminatory animus.  Eilertson's alleged response, "Well, that

would be fine. Just don't tell anybody how old you are," indicates that he thought it was acceptable for Hill to work at Tech Center until she is seventy years old.  The second part of his alleged response, "Just don't tell anybody how old you are" is ambiguous and may have a negative connotation (that working at age 70 is something that should be hidden), but it is not direct evidence that Eilertson terminated Hill because of her age.  Finally,  Eilertson's alleged statement that he inquired as to Hill's musical taste to discern her age because he could not legally ask her that before she was hired is also not direct evidence of age discrimination. Eilertson's alleged inquiry might have been circumstantial evidence of age bias if Eilertson had not hired Hill because of her perceived age based upon her response.  However, Eilertson's alleged desire to know Hill's age does not show that he discriminated against her because of her age.  In short, none of these statements constitute direct evidence.  *See Blair v. Henry Filter's Inc.*, 505 F.3d 517, 525 (6th Cir. 2007) (in the absence of a link between the age-related slurs and the adverse employment action, an inference is required to link age-based animus to the discharge and thus the statements did not constitute direct evidence).

*Circumstantial Evidence:*

*Prima Facie Case*

Having determined that Hill does not have direct evidence of discrimination, this court will analyze her claim under the four-part burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  To establish a prima facie case of wrongful discharge based on age, the plaintiff must show that: (1) she was at least 40 years old at the time of his discharge; (2) she was subjected to an adverse employment action; (3) she was qualified for the position involved; and (4) she was ultimately

-9-

replaced by a younger individual. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir.1994).  If such a showing is made, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the discharge.  Once that explanation is advanced, the burden of production returns to the plaintiff to show that the reason offered by the employer was merely a pretext for discrimination.  *Id.*  At all times, however, the ultimate burden of persuasion remains upon the plaintiff.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Defendants do not contest that Hill is within the protected class or that she suffered an adverse employment action.  Defendants argue that Hill cannot show a prima facie case of age discrimination because she is not qualified and because she was not replaced by a younger employee.

With respect to Hill's qualifications, defendants assert that her poor performance and failure to adhere to sales requirements rendered her unqualified.  Defendants' reliance on *Irwin v. Marquette Med. Sys, Inc.*, (S.D. Ohio 2000) is stale.  Hill correctly identifies the Sixth Circuit's holding that "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.  To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by

-10-

the defense as its reason for terminating plaintiff.")).  Thus, Defendants cannot rely upon Hill's poor performance as evidence that she was not qualified for her position.  There is no other evidence to show that she was unqualified for her position as a salesperson.  To the contrary, the evidence shows that Hill was qualified for her position considering that she previously owned and managed a similar business.

### *Replacement by a significantly younger employee*

Defendants contend that Hill was not replaced because they did not hire anyone to fill her position following her termination.  Hill claims that forty-four year-old employee Lisa Jaguinic, who was hired about three months before Hill's termination, replaced her.  Defendants claim that Jaguinic could not have replaced Hill because Hill had not placed any employees with customers in the months leading up to her termination, thus, she did not have any responsibilities to redistribute.  Hill points out that Jaguinic took over Hill's former function of managing SROC/Tech Center's classified advertising with the *Akron Beacon Journal*.  "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990).  Hill has not presented any evidence that Jaguinic was hired to perform Hill's duties or that she was reassigned to perform Hill's duties.  The evidence in the record shows that Jaguinic assumed Hill's classified advertising duties in addition to her own duties.  Thus, under Sixth Circuit precedent, she did not replace Hill.  This court does not base its award of summary judgment to

-11-

Defendants on a failure to establish a prima facie case, however, and will continue its analysis of Hill's claim. The prima facie case is intended to be a low threshold. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

### *Legitimate nondiscriminatory reason for termination*

Defendants contend that Hill was terminated because of poor performance, specifically, failure to generate a sufficient amount of sales.[2] Poor sales performance is a legitimate, nondiscriminatory reason for termination. *See Shiffman v. Thermal Indus., Inc.*, No. 1:05cv214, 2006 WL 2613000, *3 (S.D. Ohio Sept. 8, 2006). Tech Center and SROC met their burden of articulating a legitimate, nondiscriminatory reason for Hill's termination.

### *Pretext*

Once the defendant succeeds in putting forth a legitimate, nondiscriminatory reason for the plaintiff's termination, the burden shifts back to the plaintiff to show that the defendants

---

[2]In the introduction portion of their memorandum in support of summary judgment, Defendants set forth two reasons for Hill's termination: poor sales performance and that she was "ill-tempered and uncooperative." In the facts section, Defendants posit that Hill "was an uncooperative and insubordinate employee. She was verbally abusive and she was not a team player." Indeed, in his September 20, 2005 termination letter, Eilertson lists several instances where Hill was allegedly insubordinate or uncooperative. Hill apparently denies that she was insubordinate or uncooperative. Inasmuch as there are no witnesses or contemporaneous documentation regarding Hill's alleged unprofessional behavior and Hill does not concede these matters, it comes down to a credibility determination which is outside the bounds of consideration on summary judgment. The bulk of Defendants' memorandum, however, focuses only on Hill's sales performance as the grounds for her termination and is the legitimate, nondiscriminatory reason considered by this court.

proffered reason was not its true reason, but merely a pretext for discrimination.  *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *see Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994) ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions] the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). Pretext is established by showing that (1) the stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) that the stated reasons were insufficient to explain the defendant's action.  However, "[a] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hughes v. General Motors Corp.*, 212 Fed.Appx. 497, 502 (6th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Hill seeks to establish pretext by arguing that the reasons proffered by Defendants did not actually motivate her termination.  Hill contends that Eilertson terminated her because of her age.  Defendants argue that because Eilertson is over 50 years of age and because he hired Hill when she was 56 years old, is further evidence that he did not terminate her because of her age. Hill is correct that the "same actor" inference does not advance Defendants' claim to summary judgment.  First, Hill claims that Sanford Rose, not Eilertson, hired her in 1999.  Further, the six year-time span between Hill's hiring and termination limit the applicability of the inference.  *See Stockman v. Oakcrest Dental Center, P.C.*, 480 F.3d 791, 800 (6th Cir. 2007) ("where the same person hires the employee and fires him within a short period of time, especially where the employee's class has not changed, there is a strong contrary inference of discriminatory intent"). The time span between Hill's hiring and termination and her claim that Sanford Rose, not

-13-

Eilertson, hired her militates against the "same actor inference" at summary judgment.

Hill relies upon Eilertson's alleged age-related remarks as evidence that the real reason he terminated her was because he harbors negative attitudes towards older workers. The Sixth Circuit has said that "statements allegedly showing an employer's age bias are to be evaluated by considering four factors: (1) whether the statements were made by a decision-maker or an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the [adverse action]." *Peters v. Lincoln Electric Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002). Here, Hill attributes each of the statements she relies upon as evidence of age discrimination to Eilertson, who is the decision-maker. As to the second and fourth factors, there is no evidence that they were made in the context of Eilertson's decision-making process with respect to Hill's discharge and there is no evidence that the statements were made proximate in time to Hill's termination. Finally, as to the third prong, the statements, as explained, *supra*, in the discussion of direct evidence, are vague, ambiguous and isolated remarks. In sum, considering Eilertson's alleged remarks within the Sixth Circuit's framework, they may be properly characterized as stray remarks, which are not sufficient to give rise to a triable inference of discrimination. *See Kahl v. Mueller*, No. 98-1176, 1999 WL 196556, at *4 (6th Cir. Apr. 1, 1999) (stray remarks are "insufficient to give rise to an inference of discrimination as they are topically and temporally distant from [the] termination"); *see also Hausler v. General Electric Co.*, No. 04-3023, 2005 WL 1385934, *3 (6th Cir. 2005) (decision-maker's comments about wanting a younger, more talented, more aggressive and more mature workforce were so isolated and ambiguous that they were legally

-14-

insufficient to create a material issue of fact as to whether plaintiff's termination was motivated by age discrimination).

Hill also seeks to establish pretext by arguing that the reasons Defendants terminated her were not sufficient to motivate her discharge.  Hill claims that the day she was terminated was the first time Eilertson ever told her she could be fired for sales performance.  In her deposition, however, Hill admitted that she was aware that "one of her primary jobs . . was to generate sales and marketing for the whole company. . . ." and that she believed that she was expected to make placements to generate income for the company, and she acknowledged that she could be fired if she was an unproductive employee.  (Hill dep. at 77-78; 96).  Moreover, Hill has not pointed to a policy or practice of SROC/Tech Center that required progressive discipline or shown that younger employees were warned prior to termination for poor sales performance.

Hill also points out that Eilertson has not terminated every employee who did not meet the 1 to 3 ratio of wage to sales.  Hill relies upon a chart that defendants provided to the Ohio Civil Rights Commission that lists employees (which identified employees by a letter as opposed to their name), the employees' wages, gross sales margin and the ratio of wages to gross sales.  Hill highlights that four employees had a ratio of 1 to 1 or 1 to 2, and emphasizes that those employees were not terminated.  Defendants counter that in her argument, Hill omits the information on the chart which shows that she had the worst sales record and that she was the only employee who caused the company to lose money.  Hill's omission of her own sales performance and failure to rebut defendants' characterization of her sales performance highlights the absence of pretext.  The fact that defendants chose to terminate Hill, the lowest performing employee, but not to terminate other employees performing below expectation does not establish

-15-

pretext.  Hill did not identify the ages of the other low performing employees or provide any other information about those employees that would allow this court to assess whether they are comparable and whether their continued employment creates an inference of pretext for Hill's termination.  Hill has not created a genuine issue of fact that her termination for poor performance was pretext for age discrimination.

### Breach of Implied Contract

Hill claims that in exchange for her bringing books of information about customer contacts to SROC/Tech Center, Sanford Rose promised her lifetime employment.  Defendants claim that Hill's breach of implied contract claim fails because Hill signed an employment agreement acknowledging that her employment was at-will.  Hill admits that when she began her employment with Tech Center, she signed an employment agreement that included the following provisions:

> ●     I or my employer may terminate my employment at any time, with or without cause....

> ●     This Agreement supercedes any prior employment agreement. This Agreement may not be changed except by a written agreement signed by my Manager or a Corporate Officer....

Hill admits that this is the only written agreement governing her employment.  In Eilertson's January 28, 2005 letter to Hill regarding her vice president title, he reminded Hill of her at-will employment status.  Hill claims, however, that Sanford Rose's oral promises modified her at-will employment status and created an implied contract for lifetime employment:

> • "When I started I questioned Sanford about [the noncompete clause] – and I have to paraphrase. I can't quote you directly.  "I made the comment when I saw this that it – it – you can't prevent someone from making a living, and he said, 'I

know,' but he said, 'You're going to be here for your working career. You're not going to have to worry about it.'  "So I took it to mean that there was some latitude in this.  "My conversation with Sanford led me to believe that there was latitude in this."

• "He said, 'Well, that's [non-competition clause] not an issue here. You're going to be here. This is going to be where you're going to spend your working days.'"

• "Sanford said I would be working for him as long as I wanted to work, and the reference being that I had brought them a lot of business, them meaning Mr. Eilertson and Mr. Rose, I brought them a lot of business, this would be where I would spend my working career – the rest of my working career, and Sanford said exactly that.  "'This is – this is going to be where you'll spend your working career. We don't want to lose you. You – we are family.'"

• "I understood and questioned a lot of things on here [the agreement] with Sanford and I was told it wasn't a concern, that I would be employed by him for life, I wouldn't need to worry about this, it was a formality."

To prevail on a breach of contract claim under Ohio law, Hill must show: (1) the existence of a binding contract, (2) performance by Hill, (3) breach by SROC/Tech Center, and (4) damage to Hill as a result of defendants' breach.  *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 778, 798 N.E.2d 1141, 1147 (Ohio App. 2003).  To establish the existence of an implied contract, an at-will employee must prove each element necessary to form a contract. *Daup v. Tower Cellular, Inc.*, 136 Ohio App.3d 555, 561, 737 N.E.2d 128, 133 (Ohio App. 2000).  A plaintiff must show mutual assent (*i.e.*, offer and acceptance) and consideration. *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11, 711 N.E.2d 726, 732 (Ohio App. 1998). The parties must have a meeting of the minds to limit the terms of discharge, *Schwartz v. Comcorp, Inc.*, 91 Ohio App.3d 639, 647, 633 N.E.2d 551, 556 (Ohio App. 1993), and the contract must be definite as to its essential terms, *Nilavar*, 127 Ohio App.3d at 11, 711 N.E.2d at 732.

In any action alleging breach of an express or implied employment contract, "the burden is upon the party asserting the existence of an employment contract to prove each element

-17-

necessary for the formation of the contract." *Sibley v. Alcan, Inc.*, 2007 WL 949658 (N.D. Ohio Mar. 29, 2007), citing *Baker v. Jones & Henry Engineers, Ltd.*, No. L-00-1198, 2001 WL 304088, at *2 (Ohio App. 6th Dist.2001); *see also Penwell v. Amherst Hosp.*, 84 Ohio App.3d 16, 21, 616 N.E.2d 254, 258 (Ohio App. 9th Dist.1992)(consistent with the presumption of at-will employment, "[t]he party asserting an implied contract of employment has a heavy burden ... [h]e must prove the existence of each element necessary to the formation of a contract.").

While this court has recognized that Tech Center and SROC may be considered a single employer for ADEA purposes, the same is not true under the principles of contract law.  Hill's written employment agreement was with Tech Center.  That agreement makes no mention of SROC and defines "employer" as "the party so identified executing this Agreement, as well as any successor or assignee of Employer which conducts a similar business under the same trade name(s).  It is expressly understood that any successor or assignee of Employer may enforce this Agreement."  There is no argument or evidence that SROC is either a successor or assignee of Tech Center.  It is a basic principle of contract law that only a party to a contract or an intended third-party beneficiary may enforce the agreement.  *See Ballard Group, Inc. v. DNP Intern, Inc.***,** 2006 WL 3168348*, *1 (S.D. Ohio Nov. 1, 2006) (and cases cited therein).  SROC is not a party to Hill's written employment agreement with Tech Center and thus it cannot use statements in that agreement to defeat Hill's implied contract claim.

Although it cannot rely upon the Hill's written employment agreement with Tech Center, SROC is nevertheless entitled to summary judgment on Hill's breach of implied contract claim.  Although Hill's written employment agreement was with Tech Center and  Hill considered

-18-

herself to have been employed by Tech Center(Hill dep. at 91), on December 31, 2003, Hill was placed on the SROC payroll to obtain health benefits.  Hill was then immediately leased back to Tech Center.  (Eilertson dep. 43; Eilertson Aff. ¶14).  Thus, the earliest Hill could be considered employed by SROC was December 31, 2003.   The oral promises that Hill claims give rise to an implied contract were all made by Sanford Rose–not by Eilertson.  According to defendants, Mr. Rose retired in 2002.  (Eilertson Aff. ¶4).[3]  Thus, even though Hill claims that Rose promised her life-long employment, those promises could not have applied to SROC because she was not on SROC's payroll until December 31, 2003.  Thus, any promises Mr. Rose made to Hill (even assuming they were sufficient to form the basis of a contract) were made between 1999 and 2002–the time when she was employed by Tech Center.  Thus, Mr. Rose's alleged promises cannot form the basis of an implied contract for employment with SROC.  SROC is therefore entitled to summary judgment on Hill's breach of implied contract claim.

As for Tech Center, this court must examine whether Mr. Rose's alleged oral statements to Hill were sufficient to constitute an offer of lifetime employment.  Mr. Rose's alleged statements to Hill, set forth above, are akin to statements that Ohio courts have deemed insufficient to alter an employee's at-will employment status.. *See Micek v. Flightsafety Int'l, Inc.*, No. 2:03cv1015, 2006 WL 22179,*8 (S.D.Ohio Jan. 4, 2006) (granting summary judgment to employer on plaintiff's breach of implied contract claim where promise that plaintiff would have a job with defendant "for as long as he could walk and breathe" was insufficient, as a matter of law, to alter his at-will employment status).  *See also Sagonowsky v. The Andersons,*

---

Hill has not created a genuine issue of fact as to when Mr. Rose retired from SROC.  She testified that she thought that he "left the building" in 2003, but acknowledged that she was guessing.  (Hill dep. at 185).

*Inc.*, No. L-03-1168, 2005 WL 217023, at *11-12 (Ohio App. Jan. 28, 2005)(holding that supervisor's statement that "you won't get rich at The Andersons, but you'll always have a job," was insufficient to create an implied contract of lifetime employment); *Daup v. Tower Cellular, Inc.*, 136 Ohio App.3d 555, 562-63, 737 N.E.2d 128, 133-34 (Ohio App. 2000)(president's statement that employee was going to be his "right-hand guy for a long, long time" was insufficient to establish an implied contract of continued employment).  Mr. Rose's alleged promises that Hill would be "here for [her] working career," "this is where you are going to spend your working days," that she "would be employed by him for life" are similar to the promises at issue in cases where Ohio courts have granted summary judgment to employers on plaintiffs' claims for breach of implied contract.  Because the oral promises upon which Hill's implied contract claim is based are not sufficient to alter the presumption of at-will employment, Tech Center is entitled to summary judgment on this claim.


### Promissory Estoppel

Defendants argue that they are entitled to summary judgment on Hill's promissory estoppel claim because the promissory estoppel exception to at-will employment announced in *Mers v. Dispatch Printing Co,*, 19 Ohio St.3d 100, 105, 483 N.E.2d 150 (Ohio 1985) only applies to oral contracts of employment and thus cannot be applied to alter Hill's written employment agreement.  Ohio has a strong presumption in favor of employment relationships being terminable at-will.  The doctrine of promissory estoppel, however, can restrict the ability of employers to terminate employees at-will. *Gouge v. BAX Global, Inc.*, 252 F.Supp.2d 509, 519 (N.D.Ohio 2003) (citing *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150

-20-

(1985)).

The elements of promissory estoppel are: (1) a promise, clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) reliance that is reasonable and foreseeable; and (4) injury caused by the reliance. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (Ohio 1985). *See also*, *Rigby v. Fallsway Equip. Co., Inc.*, 150 Ohio App.3d 155, 779 N.E.2d 1056, 1061 (2002). And the test for promissory estoppel is: (1) whether the employer should have reasonably expected its representation to be relied upon by its employee; and if so, (2) whether the expected action or forbearance actually resulted in and was detrimental to the employee. *Gouge*, 252 F.Supp.2d at 519. "To maintain a promissory estoppel claim, an at-will employee must allege detrimental reliance on specific promises of job security." *Id.* The promise must be clear and unambiguous it its terms, and the detrimental reliance must be justified and reasonable. *Id.* "The meaning of the ... promise, and whether the acts flowing from it were reasonable, are questions of fact for jury determination." *Mers*, 19 Ohio St.3d at 105, 483 N.E.2d 150.

Contrary to defendants' assertion, a "promissory estoppel claim is not necessarily foreclosed by the fact that [the employee] signed documents acknowledging that he was an at-will employee who could be terminated at any time." *Micek v. Flightsafety Int'l, Inc.*, No. 2:03cv1015, 2006 WL 22179,*8 (S.D.Ohio Jan. 4, 2006), citing *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir. 1992). *But see Bruce v. Office Depot, Inc.*, 2005 WL 1620399, *3 (S.D. Ohio July 5, 2005) ("Defendant is entitled to summary judgment on Plaintiff's claims of breach of express and implied contract and promissory estoppel, because he signed an employment contract with Defendant, which provided that he was employed as an at will

employee and that he could be discharged at any time without cause.").

Several courts, however, have recognized that a written at-will agreement, particularly where, as here, the agreement requires written modification to alter that agreements, makes an employee's reliance upon oral representation of job security unreasonable.  *See Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp.2d 706, 729 (S.D.Ohio 2006)("Klaus's reliance on any alleged promises would have been unreasonable in light of her Employment Agreement which provides that her employment 'may be terminated at any time, by either party, with or without cause' and contains an integration clause indicating that it was 'the entire understanding' of the parties regarding employment, and could not be amended or modified unless by written instrument executed by both parties."); *Rolsen v. Lazarus, Inc.*, 2000 WL 1434170,*6 (Ohio App. Sept. 29, 2000) (even if supervisor had made a promise of continued employment to plaintiff, plaintiff could not have reasonably relied on the promise because she was expected to have read and understood the language in her employment application, which indicated plaintiff's employment was at-will and her at-will status could only be modified in writing and signed by the vice president); *Melott v. ACC Operations, Inc.*, No. 2:05cv063, 2006 WL 1892656, *7 (S.D.Ohio July 10, 2006) (plaintiff's reliance on alleged promises of job security not reasonable where she had signed an "Acknowledgment" that she was an at-will employee and her status could only be changed by a written agreement signed by the CEO).  Thus, Hill's alleged reliance is unreasonable as a matter of law.

Defendants are entitled to summary judgment , in any event, because under Ohio law, a promise must be clear and unambiguous in its terms to form the basis of a promissory estoppel claim.  *Rudy*, 85 Ohio App.3d at 154.  Vague or nebulous assurances of job security are not

sufficient. *Gouge*, 252 F.Supp.2d at 519 (holding that "I don't want you guys to worry about it, we're going to take care of you.  You guys are going to get to run it," is not specific enough for promissory estoppel).  The alleged promises upon which Hill claims she relied are the type of vague and nebulous assurances of job security which have been held to be insufficient to state a viable claim for promissory estoppel.  *See also Lake v. Wolff Brothers Supply, Inc.*, No. 63959, 1993 WL 462866, at *5-7 (Ohio Ct.App. Nov. 10, 1993) ("with this kind of partnership, you will have a job until you retire" and "don't worry, if you do this well, you will have this position forever," were not specific promises of continued employment); *Snyder v. AG Trucking, Inc.*, 57 F.3d 484, 489 (6th Cir. 1995) (holding defendants' alleged promise was not sufficiently specific to induce reliance where plaintiff testified at his deposition that the president and vice president told him that "there would be a place there [at the new terminal] for me.  That I would be given every opportunity to go and grow with the company.  I was told about the retirement plan and could expect to be there until retirement."); *Dunn v. Bruzzese*, 874 N.E.2d 1221, 1228 (Ohio App. 2007) (affirming summary judgment for employer on plaintiff's promissory estoppel claim and holding that statements including "This is where we're going to retire from" and "Where I go, [plaintiff] goes.  The day that [plaintiff] retires is that day that I retire" were not clear, unambiguous promises of continued employment); *Vickers v. Wren Indus., Inc.*, 2005 WL 1685101, *10 (Ohio App. July 8, 2005) (holding statements to plaintiff that "'you don't ever have to worry * * * [a]s long as our doors are open, you've got a-you have got a job" and "we would like for you to stay here and retire" were insufficient as a matter of law, to constitute a claim for lifetime employment).  The promises Hill claims Rose made to her are akin to the promises Ohio state and federal courts have found to be insufficient for promissory estoppel and

appropriate for summary judgment.  Accordingly, this court grants summary judgment to defendants on Hill's promissory estoppel claim.

***Conclusion***

For the foregoing reasons defendants Tech Center, Inc.'s and Sanford Rose Opportunity Center's motion for summary judgment (Docket No. 23) is granted and judgment is entered in defendants' favor.

_____s/James S. Gallas_____
United States Magistrate Judge

Dated: November 19, 2008